In the
# United States Court of Appeals
### For the Seventh Circuit

_____

No. 22-1925

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RUSSELL CHARLES TAYLOR,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cr-00116-TWP-DML-1 — **Tanya Walton Pratt**, *Chief Judge*.

_____

ARGUED DECEMBER 6, 2022 — DECIDED MARCH 24, 2023

_____

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This direct criminal appeal presents an unusual question about the validity of a search warrant. The text of the warrant appears to have been altered by police officers to expand its scope, without any indication that the issuing judge approved the changes.

In the autumn of 2014, Indiana law enforcement began investigating appellant Russell Taylor for suspected child

pornography and bestiality crimes. The primary source of in-criminating information against Taylor was "Jane Doe," a woman with whom Taylor and his wife were intimately in-volved. At relevant times, Doe was also intimately involved with two members of law enforcement, one active and one re-tired, who were involved in the investigation.

More than six months later, in April 2015, law enforcement presented a warrant application to a state-court judge. The warrant affidavit sought to establish probable cause to search Taylor's residence for evidence of both child pornography and bestiality. The affidavit did not disclose that two of the law enforcement officers involved in the investigation were or had been potentially competing with Taylor for Doe's affec-tions. Based on that affidavit, the judge signed a typed war-rant that authorized law enforcement to search Taylor's resi-dence for evidence of child pornography. The typed warrant did not mention bestiality. At a time unknown and under cir-cumstances also unknown, the lead detective in the case ap-parently made handwritten alterations to the warrant, adding "bestiality" to the warrant's scope.

When officers executed the altered warrant, they found lots of evidence of child pornography, including evidence that Taylor was producing and distributing it. Ironically, though, the officers found no evidence of crimes of bestiality. Facing federal child pornography charges, Taylor moved to suppress the evidence obtained in that search. Both that mo-tion and his request for a *Franks* hearing were denied. See *Franks v. Delaware*, 438 U.S. 154 (1978). Taylor ultimately pled guilty to multiple counts relating to child pornography and was sentenced to 324 months in prison. Taylor now appeals those denied motions, arguing that the warrant affidavit

included material false statements and omissions, and that the warrant's handwritten alterations rendered it invalid.

We agree with Taylor that the affidavit did not support probable cause to search for evidence of child pornography, but we find that the affidavit did support probable cause to search for evidence of crimes of bestiality. The unusual problem in this case is that the crime for which the affidavit established probable cause—bestiality—is not the crime for which the typed text of the warrant authorized a search. We simply do not know whether the issuing judge approved law enforcement's handwritten alterations to the warrant before it was executed. An evidentiary hearing is needed to figure out what happened. It should then be possible to resolve the questions raised by those handwritten changes and Taylor's other challenges to the warrant.

I.  *Factual Background*

Taylor pled guilty to many serious crimes against children. That said, the constitutional issues here depend less on the details of his suspected and admitted crimes and more on the details of the police investigation of him.

From at least March 2011 until his arrest in April 2015, Russell Taylor sexually exploited minor children at his residence in Indianapolis, where he lived with his wife Angela and her two children. Taylor and Angela installed hidden cameras throughout their house. The Taylors then produced child pornography by surreptitiously recording numerous children while they were fully nude, with their genitals exposed, and, at times, engaged in sexual acts with Taylor and

other children. Taylor distributed some of this pornographic material to others, including his employer, Jared Fogle.[1]

Indiana State Police began investigating Taylor in September 2014. The investigation started when Jane Doe, a woman who had been sexually involved with both Taylor and his wife, was texting with Taylor. Present with Doe during the text exchange was Indiana State Police Master Trooper Patrick Etter. Doe and Etter were apparently friends at the time, and they sat together "laughing" and "egging it on" as Taylor sent Doe several texts, including an image of bestiality, that officers later used to apply for a search warrant.

The government relies heavily on this text exchange from that day:

> Doe:      Any more pics I can masturbate over?
>
> Taylor:   Lol. Tell me what you want to see. I got it all.
>
> Doe:      Everything.
>
> Taylor:   Pics or video?
>
> Doe:      Both?
>
> Doe:      I want that

---

[1] From 2009 until his arrest, Taylor was the executive director of the Jared Foundation, a charitable organization founded by Fogle that focused on fighting childhood obesity. In 2015 Fogle pled guilty to distributing, receiving, and conspiring to distribute child pornography and traveling and attempting to travel to engage in sex with a minor. *United States v. Fogle*, 825 F.3d 354, 356–57 (7th Cir. 2016). The investigation of Fogle began with the investigation of Taylor. When law enforcement searched Fogle's home and devices, they discovered child pornography on Fogle's phone that Fogle had received from Taylor. *Id.* at 356.

No. 22-1925                                                                    5

| | |
|---|---|
| Taylor: | You get them |
| Doe: | Yeah! Can I have more? |
| Doe: | I love them! So hot |
| Taylor: | Yes What. Type? Her with dogs, orgy, s and m, young girls, etc |
| Doe: | Young orgy |
| Doe: | Any of you and her? |
| Taylor: | Yes |
| Taylor: | How young are you ok with |
| Doe: | Legal age |
| Taylor: | Ok |
| Taylor: | I wanted to ask lol. Keep in mind we do travel to Thailand on occasion :-) |

Although the timeline is uncertain from the current record, at some point following this text exchange, and before law enforcement applied for a search warrant more than six months later, Trooper Etter and Doe became romantically involved. The government asserts that their romantic relationship had ended by the time the warrant affidavit was prepared, but there is no such evidence in the record.

Within two days of witnessing this text exchange, Etter contacted Kevin Getz, a detective for the Indiana State Police who worked in the Internet Crimes Against Children Unit. On October 3, Getz interviewed Doe at her home while Sergeant Christopher Cecil of the Cyber Crimes Unit performed a forensic data extraction of her phone.

Doe said she had met Taylor eight years earlier while she was working at an adult club in Indianapolis. Doe and her husband had become friends with Taylor, who often visited the club. After Doe's husband died in 2013, Doe responded to a text message that Taylor sent to her husband's phone. Doe and Taylor talked off and on for a few months, and eventually Doe started socializing with Taylor and his wife.

According to Doe, once they all began socializing in person, Taylor "started getting more comfortable." He began asking about the horses Doe boarded on her property. On "five or six occasions" Taylor expressed an interest in going over to Doe's "house in the middle of the night" so that his "wife could … do something" sexual with one of the horses. Taylor had also texted Doe a photograph that he claimed was of his wife engaging in "some kind of sexual interaction" with a dog. Accompanying the photo was a text from Taylor that read: "Here's Angie with her ex's dog."

During the interview Doe also said that "someone" had told her to stay away from Taylor because he was under investigation for drug trafficking. When Getz asked if Doe knew who in law enforcement was working the case, she replied, "I'll run out and find out." As the interview transcript reveals, Doe meant that she would ask Ron Santa, a former police detective with whom Doe was intimately involved and who was at that moment at Doe's home. Doe retrieved Santa, and Getz and Cecil put Doe's interview on pause to interview him.

Santa said he did not "know much about" Taylor. He had met Taylor once at Doe's home and was able to identify Taylor, but Santa said he could not "remember the context" of their prior conversation and encounter. When he had heard

Taylor's name, however, Santa had associated Taylor with a drug investigation he had been aware of before he retired.

When the detectives resumed their interview with Doe, Getz focused on the text exchange between Taylor and Doe that Etter had observed a few days earlier. Taylor had referred to Thailand, texting "Keep in mind we do travel to Thailand on occasion." Getz wanted to know whether Taylor had ever actually been to Thailand. As far as Doe knew, the Taylors had never been to Thailand, and she had never heard them say anything about planning to go there. Although she didn't "know where [the Thailand reference] came from," she suspected that Taylor referred to Thailand "just … to cover up what he said" about "young girls."

Getz also repeatedly asked Doe whether Taylor had ever expressed "any interest in having sex with children." Doe could not recall Taylor ever indicating an interest in children. Taylor and his wife were "just swingers." While Doe considered Taylor to be "the type of person that seems to be very sexually involved in whatever," anything involving children "was never brought up." To be sure, Taylor "had a history of … talking about bondage, bestiality," and other sexual topics, but "not about kids." To Doe, the only "red flag" was Taylor asking if she "wanted to see a picture of him with … young girls."

Finally, Getz wanted to know whether Taylor was taking any potentially criminal photos himself or downloading them from somewhere. Taylor had never sent Doe any photos of "young girls," and Doe "couldn't tell" whether Taylor would be "the one … taking the pictures" if they did, in fact, exist.

When the detectives finished interviewing Doe, Cecil took her phone to complete the forensic data extraction. In addition to the text exchange mentioning "young girls" and "Thailand," the data extraction revealed several exchanges in which both Taylor and his wife expressed an interest in having sex with animals.

Getz continued the investigation by visiting two bestiality-oriented websites that Taylor had recommended to Doe. He also surveilled the Taylor residence and confirmed that the two vehicles parked there were registered to Angela. He likewise confirmed that the Taylors both received mail at that residence.

For reasons not clear from the record, Getz took no further action for nearly four months. In late January or February 2015, he sought information about the locations for a mobile phone number that was assigned to the Jared Foundation and that listed Taylor as the account's contact. In February Getz received a week's worth of results for that number, which generally showed the phone in the vicinity of Taylor's residence.

Getz then began drafting a search warrant application. Referring to Doe as "a female friend" who had "approached" Etter because she was "concerned" by text messages she had received from Taylor, the warrant affidavit asserted that probable cause existed to search the Taylors' residence for evidence that one or more individuals residing there were engaging in bestiality in violation of Indiana Code § 35-46-3-14 and possessed child pornography in violation of Indiana Code § 35-42-4-4.

While the affidavit asserted that probable cause existed to search for evidence relating to crimes of both bestiality and child pornography, the typed search warrant itself referred only to "evidence of possession and/or dissemination of child pornography." The warrant also has four handwritten alterations, however. The record tells us nothing about when and under what circumstances those alterations were made. One added "cell phones" to the list of items to be seized. Critically, the other three amended the scope of the search to include evidence of "bestiality." Three of the alterations were initialed by "KLG," whom we take to be Detective Kevin Getz. One alteration adding "bestiality" was not initialed at all. None of the changes was dated, and none was signed or even initialed by a judge.

On April 23, 2015, Getz swore to the veracity and completeness of the warrant application before a state-court judge who approved and issued the warrant that same day. On April 29, law enforcement executed the warrant. The search uncovered evidence of both possession and production of child pornography, but no evidence of bestiality. Taylor was arrested.

II.  *Procedural History*

This case has a long history. Taylor was charged in federal court with twelve counts of sexually exploiting children and one count of receiving, distributing, and conspiring to receive and distribute child pornography. On December 10, 2015, Taylor pled guilty to all counts and was sentenced to 324 months in prison.

In late 2016, Taylor filed a motion under 28 U.S.C. § 2255 challenging his convictions on several grounds, including his

counsel's failure to challenge the April 2015 search warrant. The district court granted relief in February 2020, vacating Taylor's guilty plea and sentence. In May 2020, Taylor was charged in a new 34-count indictment that alleged: sexual exploitation of minors and attempted sexual exploitation of minors; coercion and enticement; receipt, distribution, and possession of visual depictions of minors engaging in sexually explicit conduct; and conspiracy to possess visual depictions of minors engaging in sexually explicit conduct.

This time Taylor filed a motion to suppress the evidence obtained from the searches of his residence in April 2015. He also requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), on his claims that Getz had secured the initial search warrant by knowingly, or with reckless disregard for the truth, including false information in and omitting material information from the warrant affidavit. Taylor also asserted that Getz had altered the search warrant after it had been issued to encompass evidence of bestiality.

The district court denied both the motion to suppress and the request for a *Franks* hearing. *United States v. Taylor*, No. 1:20-cr-00116-TWP-DML-01, 2021 WL 2417341, at *10 (S.D. Ind. June 14, 2021). Taylor reached a conditional plea agreement, pleading guilty to 30 charges but reserving his right to appeal the denial of his motion to suppress. Taylor was again sentenced to 324 months in prison.

Taylor now appeals, challenging the denial of his motion to suppress. He seeks a *Franks* hearing on whether Getz knowingly, intentionally, or with reckless disregard for the truth included false material statements in and omitted material information from the warrant affidavit. Taylor also argues that the affidavit did not support probable cause to search for

evidence of either child pornography or bestiality. He also argues that the court should have held a hearing on the handwritten alterations to the warrant.

III. *Analysis*

The Fourth Amendment "was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). The Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

At the "very core" of this guarantee "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013), quoted in *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). The home is deemed "so sacred" that it is protected by the Supreme Court as both a "constitutionally protected area" and an area where a person holds a "reasonable expectation of privacy." See *Jardines*, 569 U.S. at 7–8, 10–11, quoting *Entick v. Carrington*, 2 Wils. K.B. 275, 291, 95 Eng. Rep. 807 (K.B. 1765). Subject to only a few specifically established and well-delineated exceptions, the search of a home is "per se unreasonable" unless it is conducted pursuant to a valid warrant. *Katz v. United States*, 389 U.S. 347, 357 (1967). No exceptions apply in this case, so the central question posed by

Taylor's motion to suppress was whether the search of his home was authorized by a valid search warrant.

The warrant requirement demands that law enforcement obtain a warrant from "a neutral and disinterested magistrate before embarking upon a search." *Franks*, 438 U.S. at 164. The magistrate "must determine independently whether there is probable cause," *id.* at 165, for it is "the magistrate's scrutiny," and no one else's, that "is intended to eliminate altogether searches not based on probable cause." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Individual security against Fourth Amendment violations would otherwise be left "only in the discretion of the police." *Katz*, 389 U.S. at 358–59, quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964). Endowing law enforcement with such discretion would circumvent "the safeguards provided by an objective predetermination of probable cause," and "the protections of the Fourth Amendment would evaporate." See *Beck*, 379 U.S. at 96, 97. In short, a neutral magistrate must decide probable cause before the police conduct a search.

But a neutral decision-maker is not enough. A magistrate's decision depends on the facts submitted in the warrant application. That factual showing must be both truthful and complete. *Franks*, 438 U.S. at 164–65 (truthful); *United States v. McMurtrey*, 704 F.3d 502, 513 (7th Cir. 2013) (complete). To be sure, truthfulness does not require that "every fact recited in the warrant affidavit is necessarily correct," *Franks*, 438 U.S. at 165, nor does completeness require law enforcement to "provide every detail of an investigation." *McMurtrey*, 704 F.3d at 513. But truthfulness does require that the information in the affidavit be "believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165. Law enforcement also may

not "deliberately omit information the magistrate needs to assess fairly the issue of probable cause." *McMurtrey*, 704 F.3d at 513.

Taylor challenges all of these foundations for a valid warrant. He challenges the honesty and completeness of the underlying affidavit, and he questions whether the warrant itself shows probable cause determinations made solely by a neutral magistrate.

In Part A we address Taylor's challenges to the warrant affidavit, including whether probable cause would exist to search for evidence of either child pornography or bestiality if the affidavit's alleged infirmities were corrected. We find that the affidavit supported probable cause to search for evidence of bestiality, but not for evidence of child pornography. Even without taking the alleged infirmities into account, the affidavit failed to establish probable cause for child pornography. In Part B we then focus on the warrant itself, considering whether this search warrant fulfilled the Fourth Amendment's promise that all probable-cause determinations be made by a neutral magistrate. Given the unexplained handwritten alterations, the record does not show that it did.

Because probable cause existed only for bestiality and because there is no evidence that the issuing judge approved the handwritten alterations authorizing a search for evidence of bestiality, an evidentiary hearing is needed. Those changes to the warrant also cannot be considered in isolation. In resolving the uncertainty surrounding the handwritten alterations, the district court will need to consider the good-faith exception to the exclusionary rule adopted in *United States v. Leon*, 468 U.S. 897 (1984). Whether Detective Getz and other law enforcement here acted "with objective good faith," *id.* at 920,

may implicate all law enforcement behavior, including the false statements and material omissions Taylor has identified. Particularly because the affiant who swore to the affidavit's completeness and veracity also seems to have altered the warrant itself, the scope of the evidentiary hearing must encompass both the affidavit's infirmities and the warrant's alterations. Evaluating how false statements and omissions affect Detective Getz's credibility and his ability to rely on *Leon* with respect to the warrant itself may affect whether Taylor's motion to suppress should have been granted. In short, the district court will need to take evidence on both the alterations to the warrant and the affidavit's false statements and deceptive omissions and will need to address all constitutional concerns raised by Taylor's motion to suppress.

A. *The Affidavit & Probable Cause*

An affidavit supporting a search warrant is presumed valid. *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000), citing *Franks*, 438 U.S. at 171. This presumption of validity is based on the assumption that, when law enforcement officers make a factual showing to a neutral and detached magistrate, it "will be a *truthful* showing." *Franks*, 438 U.S. at 164–65, quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966) (emphasis in *Halsey*). This does not mean that every fact in the affidavit must turn out to be correct. As explained in *Franks*, probable cause may be based on hearsay, and warrant applications often must be prepared quickly. *Id.* at 165. But "a search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge." *McMurtrey*, 704 F.3d at 508, citing *Franks*, 438 U.S. at 155–56. A warrant may also be invalid if, in the underlying affidavit, the police make "a material omission"

that is "designed to mislead or was made in reckless disregard of whether it would mislead" the issuing judge. *Id.* at 511 n.5.

Under *Franks*, a defendant must first make a substantial preliminary showing that law enforcement knowingly and intentionally, or with reckless disregard for the truth, made either a false material statement or a material and deceptive omission in the underlying warrant affidavit. If the defendant makes that showing, the Fourth Amendment requires an evidentiary hearing on the veracity and completeness of that affidavit, and "ultimately on the constitutionality of the search." *McMurtrey*, 704 F.3d at 508, quoting *Franks*, 438 U.S. at 155–56.

The presumption of validity is not easy to overcome. "The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses." *Id.* at 509, citing *Franks*, 438 U.S. at 171. Even if the defendant meets these requirements of specificity and support, "the defendant must also show that if the deliberately or recklessly false statements were omitted, or if the deliberately or recklessly misleading omissions included, probable cause would have been absent." *Id.*, citing *Franks*, 438 U.S. at 171–72. A defendant is entitled to a *Franks* hearing only if, after removing the allegedly false statements and adding the omitted information, the affidavit's "content is insufficient" to support a finding of probable cause. *Franks*, 438 U.S. at 171–72. At that hearing, the defendant must then prove that the false statements and/or the misleading omissions were the result of reckless or deliberate action, not innocent human error. *United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013) ("A showing of reckless disregard requires more

than a showing of negligence"). "This is a subjective inquiry that focuses on the officer's state of mind." *Id.*

We review a district court's denial of a defendant's request for a *Franks* hearing for clear error. *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009). We give deference to the district court's factual findings, but we review legal determinations de novo. *United States v. Harris*, 464 F.3d 733, 737 (7th Cir. 2006). In this case, while not all of the questions raised by Taylor's challenge to the warrant affidavit and the warrant itself fit neatly into *Franks*, Taylor has made such a substantial preliminary showing.[2]

---

[2] We need not decide here whether, without the unexplained alterations to the warrant, Taylor would be entitled to a hearing under *Franks* alone. Even accounting for the false material statements and material omissions that Taylor has identified, the affidavit showed probable cause to search for evidence of bestiality. While the affidavit did not support probable cause to search for evidence of child pornography, probable cause for at least one of the two crimes would ordinarily be sufficient to render a *Franks* hearing unnecessary. *Franks*, 438 U.S. at 171–72. This is not, however, an ordinary case. The affidavit's alleged infirmities—including the exaggerations of the information from Jane Doe and the failure to acknowledge Doe's intimate relationships with both the target of the investigation and with two members of law enforcement involved in the investigation—together with the fact that law enforcement altered the scope of the warrant—all cast substantial doubt on both the affidavit and Getz's candor with the issuing judge. We doubt that evidence relevant to Getz's honesty and attention to the truth in the investigation can be cabined into separate episodes. The record on these circumstances is limited, but we do not think it would be prudent to limit in advance the scope of the district court's hearing, particularly since *Franks* focuses on the subjective honesty of the warrant application. 438 U.S. at 155–56; see also *United States v. Leon*, 468 U.S. 897, 914 (1984) ("deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit upon which that determination was based"); *United*

Detective Getz's affidavit began by asserting that it was "made in support of an application for a warrant to search" Taylor's residence "for evidence of violations" of Indiana Code § 35-46-3-14, which criminalizes sexual acts that constitute bestiality. The statute does not criminalize the possession or distribution of images of bestiality, but only conduct that amounts to bestiality. The affidavit sought to establish "probable cause to believe that an individual or individuals located" at the Taylors' residence were "engaged in bestiality." The affidavit added that law enforcement's investigation also concerned material involving the sexual exploitation of minors, the production, dissemination, or possession of which is prohibited by Indiana Code § 35-42-4-4.

All of the facts supporting probable cause to find evidence either that the Taylors were engaged in bestiality or that they produced, possessed, or disseminated child pornography

---

*States v. Woodfork*, 999 F.3d 511, 518 (7th Cir. 2021), quoting *United States v. Daniels*, 906 F.3d 673, 677 (7th Cir. 2018) (*Franks* test is subjective); *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014); *Williams*, 718 F.3d at 650 ("This is a subjective inquiry that focuses on the officer's state of mind."); *United States v. Residence Located at 218 Third St.*, 805 F.2d 256, 258 (7th Cir. 1986) (explaining subjective standard and affirming factual finding that officer did not act with reckless disregard for truth). The focus of the hearing will need to be on what Getz knew about those personal relationships when he applied for and executed the search warrant. In addition, to the extent that Etter (and perhaps Santa) supplied relevant information to Getz for the investigation that led to the affidavit, their candor may be relevant as well. See *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994) (under *Franks*, honesty of other government agents may also be relevant), quoting *United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir. 1984); accord, *Glover*, 755 F.3d at 820. On remand, the district court should make factual findings on all relevant issues so that all factual and legal issues can be resolved at one time.

were drawn from the interview with Doe, the data extraction from her phone, and the mobile locator data provided by AT&T.[3]

First, Getz framed how the investigation had begun: "In September 2014, Master Trooper Patrick Etter (ISP) contacted me regarding a possible bestiality and child pornography investigation involving a person identified as Russell C. Taylor (Russell). Master Trooper Etter stated he had been approached by a female friend, Jane Doe." Doe "had become friends" with Taylor and his wife and "had received several text messages" from Taylor "which concerned her." The affidavit then laid out the factual basis for probable cause.

"Probable cause deals 'with probabilities.'" *Illinois v. Gates*, 462 U.S. 213, 241 (1983), quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949). That is, probable cause is concerned with "the factual and practical considerations of everyday life on which reasonable and prudent" persons, and not "legal technicians, act." *Brinegar*, 338 U.S. at 175. Probable cause is present "when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime." *McMurtrey*, 704 F.3d at 508, citing *Gates*, 462 U.S. at 238.

---

[3] Taylor challenges the affidavit's omission of details from the mobile locator data and the phone's account information. We find nothing deceptive in the omitted details. The issuing judge could make an informed and objective decision about probable cause without having to wade through all of the phone data on his or her own. Even if all the omitted information had been included, Taylor would still have been shown as associated with the phone, and the phone would still have been placed frequently at the Taylors' residence.

No. 22-1925                                                    19

When considering an application for a warrant, the task of the issuing judge "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Where a district court refuses to suppress the fruits of a search made pursuant to a warrant, our standard of appellate review is "complex." *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008). The "district court's findings of historical fact are reviewed for clear error," but we "give no weight" to either the district judge's legal conclusions or her determination that "the facts add up to probable cause." *Id.*, citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Rather, when we address whether probable cause supported a warrant, our inquiry is "whether the judge *who issued the warrant* … acted on the basis of probable cause." *Id.* (emphasis added). In short, we are concerned less with the district court's review than with "the issuing judge's conclusion that probable cause has been established." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008). We review the district court's analysis de novo, but we afford "'great deference' to the issuing judge's" finding of probable cause. *McIntire*, 516 F.3d at 577–78, quoting *Ornelas*, 517 U.S. at 698.

Still, like the district court before us, our task is "to ensure that the magistrate had a 'substantial basis'" for finding the probable cause necessary to support the warrant. *Gates*, 462 U.S. at 238–39, quoting *Jones v. United States*, 362 U.S. 257, 271 (1960) ("substantial basis" to conclude that evidence of a

crime is "probably present" at the location to be searched is sufficient).

    1. *Probable Cause to Search for Evidence of Child Pornography*

For evidence relating to child pornography, the factual basis presented in the affidavit came down to: (1) the text exchange between Taylor and Doe that Etter observed and (2) inferences Getz drew based on his training and experience in similar investigations. From the text exchange, Getz highlighted two things: Taylor's reference to Thailand and his offer to send Doe photos or videos of "young girls." The reference to Thailand was potentially significant because experience had taught Getz that "persons who have a sexual interest in children have been known to travel to Thailand because it is a hotspot for child sex tourism." From his investigative experience, Getz asserted, rather vaguely, that "subjects engaged in possession, production and dissemination of child pornography had included a wide range of child pornography subject matter that was not limited to: infant victims, bondage, captured sexual activity between adults and children, and bestiality."

Getz thus implied, but did not actually assert, that Taylor's offer to send images or videos of "young girls," in concert with his offer to send images of his wife "with dogs" and of "s and m," made it more likely that Taylor was involved with child pornography. Getz made clear that Taylor had not actually sent Doe any images of "young girls." He added: "When asked if [Taylor] had ever expressed interest in engaging in sexual activity with children, she responded: 'Not that I can remember, but he's the type of person that seems to be very sexually involved in whatever goes.'"

As Taylor sees it, Getz's affidavit contained both false statements and material omissions that would have influenced the issuing judge's probable-cause determination on child pornography. Correcting these infirmities, Taylor argues, shows that the affidavit could not support probable cause to search for evidence of child pornography.

First, Taylor points to Getz's statement that Etter was "approached by a female friend, Jane Doe." Taylor asserts that Doe did not "approach" Etter and that she was not just a "friend."

That Doe "approached" Etter certainly appears to be false. At her interview, Doe told Getz that Etter was *with* her while she texted with Taylor on September 28, 2014: "Pat [Etter] and I were just sitting there laughing about [Taylor's texts], all these pictures that he was sending. So, I was kind of egging it on." Doe did not "approach" Etter. What's more, there is reason to believe that Getz may have known that this characterization would be, at the very least, misleading. To be sure, when Etter first contacted Getz, Etter may have said at first that he had been "approached" by Doe, but by the time Getz swore out the affidavit, Doe had told Getz otherwise. Getz therefore falsely characterized how the investigation got started.

More concerning is Getz's description of Doe as a "female friend." This term papered over a more complex reality that would (or at least should) be material to an issuing judge. As mentioned, at some point after the September 28 text exchange, but before Getz applied for a search warrant, Doe and Etter became romantically involved. According to the government, the relationship was over by the time Getz swore out the affidavit, but we have no evidence to that effect. The best

version for the government would be that Doe and Etter were "just friends" when Etter initially contacted Getz about Taylor at the end of September 2014. And even if their relationship had come to an end by the time Getz presented the affidavit to the issuing judge, that would not have somehow removed the danger of bias in law enforcement's investigation of Taylor.

The description of Doe as Etter's "friend" can be seen as either a misleading statement or a misleading omission, given what the record discloses about the evolving nature of Doe and Etter's relationship. In a warrant affidavit, law enforcement "need not provide every detail of an investigation, nor describe every wrong turn or dead end they pursued. But they may not deliberately omit information the magistrate needs to assess fairly the issue of probable cause." *McMurtrey*, 704 F.3d at 513.

First among the information omitted from this affidavit that an issuing judge would have wanted to know was Etter's intimate relationship with Doe. We use a "totality-of-the-circumstances approach" when assessing probable cause, and "an informant's 'veracity,' 'reliability' and 'basis of knowledge'" remain "highly relevant in determining the value of [the informant's] report." *Gates*, 462 U.S. at 230. Regardless of when this friendship evolved into more or devolved into less, we think it is a material omission to fail to disclose that an officer so involved in the investigation is—or ever has been—competing with the subject of that investigation for the informant's affections. By way of comparison, we recognize in drug cases that judges and police must consider the possibility that an informant may be a *business* rival of a drug-dealer target. E.g., *United States v. Glover*, 755 F.3d 811,

816 (7th Cir. 2014) ("[T]he failure to establish the informant's reliability raise[s] the concern that the tip was provided to harass or remove a rival."), citing *United States v. Bell*, 585 F.3d 1045, 1050 (7th Cir. 2009). The same logic applies to possible romantic and sexual rivalries and jealousies influencing the investigation. Adding to the questions we have here is the timing of the investigation, since nothing seems to have happened for months after Doe provided her information about Taylor to law enforcement. We do not know what accounts for the delay and the police priorities.

An issuing judge would want to know about the relationship between Etter and Doe. An issuing judge would also need to know about the professional relationship between Etter and Getz. It is possible that Getz knew nothing of Etter's romantic involvement with Doe, but whether Getz did know might depend on how closely he interacted with Etter, both professionally and personally.

Likewise, an issuing judge would want to know about Doe's relationship with former detective Ron Santa, who was at Doe's home when Getz and Cecil interviewed her. The detectives spent about 15 minutes interviewing Santa. Aside from telling the detectives that, as far as he could remember, Taylor had been connected to a drug trafficking investigation, Santa provided little substantive information. But it is not the omission of Santa's information from the affidavit that concerns us. Rather, it is the omission of Santa's participation in Doe's interview and the omission of Santa's relationship with Doe that trouble us.

Santa was, as the government concedes, intimately involved with Doe at the time of her interview with law enforcement. Santa told Getz that he had met Taylor once at Doe's

residence, but he could not "even remember the context of the[ir] conversation." Taylor casts doubt on this, claiming that Santa had actually "confronted" Taylor at Doe's house in the summer of 2014. *Taylor*, 2021 WL 2417341, at *5.

We find it disturbing that Santa's relationship with Doe and his presence at her interview were not disclosed to the judge who issued the warrant. That Santa, who was at least arguably in competition with Taylor for Doe's affections, was involved in the investigation and that his involvement might have bolstered the detectives' confidence in Doe, are facts that a judge considering a warrant application would want to know. These unusual facts give this case the unwelcome flavor of a bad soap opera. But the judge who was supposed to make the objective judgment about probable cause should have been made aware of these intimate relationships and the potentially powerful motives for the informant and law enforcement to slant the facts.

We are also concerned by how Getz characterized Doe's information regarding Taylor's potential interest in children. Getz had questioned Doe repeatedly on this issue, and she had said repeatedly that she had seen no indication of any sexual interest in children. When asked whether Taylor was interested in sexual activities with children, Doe initially said, "Not that I can remember, but he's the type of person that seems to be very sexually involved in whatever goes." This much was included in the affidavit.

But Doe then explained what she meant by "whatever," saying that Taylor and a friend "had made a pact when they were 16 that they could never date another girl unless the girl was okay with sleeping with both of them." "So," Doe went on, "they're just swingers." Later in the interview, Getz again

asked if Taylor had "expressed interest in wanting to do something with children," or if "any of the text messages indicate that he had done something?" "In other words," Getz continued, had Taylor ever said, "yeah, my wife and I, we have done this?" Or was it "more of, we would like to do this?" Doe said that it "was never brought up." Rather, it was only Taylor's offer to send images of "young girls" that had raised a "red flag" for Doe. Still seeking clarification, Detective Cecil intervened to reframe the inquiry, remarking that there was "a history of [Taylor] talking about bondage, bestiality, and all these other things, but—." Doe finished his sentence for him: "Not about kids."

Doe had been unequivocal that children were never "brought up" and that Taylor did not talk "about kids." Yet Getz included in the affidavit only a fragment of Doe's most ambiguous response: "When asked if [Taylor] had ever expressed interest in engaging in sexual activity with children, [Doe] responded: 'Not that I can remember, but he's the type of person that seems to be very sexually involved in whatever goes.'" As Taylor sees it, including only Doe's (slightly misquoted) initial answer and omitting her "clarifying" responses created the materially misleading impression that Doe had suggested that Taylor was interested in children. We agree with Taylor, at least to the extent that Taylor is entitled to explore the issue in the hearing on remand.

Although Getz accurately reported *some* of what Doe had told him, divorcing her initial answers from context and failing to disclose Doe's later, repeated certainty was materially misleading. By way of analogy, imagine a witness to a bank robbery who is asked by a police officer if the robber was armed. At first the witness says that he can't remember, but

he imagines that the robber was the kind of person who would always be armed. Later, the witness repeatedly tells the same police officer that he is certain that the robber was *not* armed. If the officer later testified only to the witness's initial statement and intentionally, or with reckless disregard for the truth, omitted the later statements, his testimony would be materially misleading.

Finally, Taylor argues that Getz showed a reckless disregard for the truth by omitting from the affidavit Doe's belief that Taylor had never been to Thailand. In the affidavit, Getz relied on Taylor's reference to Thailand, along with his reference to "young girls," to draw an adverse inference that Taylor might be sexually interested in children:

> "Jane Doe said" that Taylor asked "if she wanted to see images of 'young girls.' Jane Doe also indicated" that Taylor had sent a text message in which he "mentioned traveling to Thailand in the past. (Based upon my training and investigation experience, I know persons who have a sexual interest in children have been known to travel to Thailand because it is a hotspot for child sex tourism.)"

Doe repeatedly told the detectives that she did not believe Taylor had been to Thailand. Indeed, Doe suggested that Taylor's reference to Thailand was "maybe … just something to cover up what he said" about "young girls." Omitting Doe's opinions and beliefs on the Thailand question, Taylor argues, was materially misleading since including them would have discouraged the magistrate from accepting Getz's adverse inference.

We disagree that these were material omissions. First, while Getz's inferences, based on his "training and investigation experience," may be helpful to the issuing judge in assessing whether it is probable that evidence of a crime will be discovered, Jane Doe's opinions and beliefs, based on only hearsay and hunches, were not *facts* upon which probable cause could, without more, have been found or rebutted. See *United States v. Davis*, 402 F.2d 171, 174 (7th Cir. 1968) ("Even in cases involving nonhearsay affidavits, the affiant's 'mere affirmance of belief or suspicion is not enough' to create probable cause."), quoting *Nathanson v. United States*, 290 U.S. 41, 47 (1933). The affidavit could justifiably omit Doe's opinions and beliefs and rely solely on the fact of Taylor's own statement that he and his wife "travel to Thailand on occasion." Excluding Doe's opinions and beliefs on the Thailand issue was not a material omission.

In sum, we agree with Taylor that Getz falsely characterized Doe as a "female friend" who "approached" law enforcement and created a materially misleading picture by omitting any reference to Doe's intimate relationships with Etter and Santa. The affidavit's selective quoting with regard to Taylor's potential interest in children was also misleading. In other words, Taylor has met his burdens of specificity and support and made the substantial preliminary showing required under *Franks*. *McMurtrey*, 704 F.3d at 509, citing *Franks*, 438 U.S. at 171.

Ordinarily, once the defendant has met these burdens, we would ask whether, "if the deliberately or recklessly false statements were omitted, or if the deliberately or recklessly misleading omissions included, probable cause would have been absent." *Id.*, citing *Franks*, 438 U.S. at 171–72. But in this

case, that inquiry is frankly unnecessary. Even without adjusting the affidavit's content to remove false statements and correct the omissions, the affidavit did not support probable cause to search for evidence of child pornography.

As the affidavit stood when it was presented to the issuing judge, factual support for probable cause to find evidence of child pornography essentially came down to: (1) Taylor's vague offer to send Doe images of "young girls"; (2) Taylor's reference to Thailand; and (3) Detective Getz's claim that his training and experience connected child pornography to both Thailand and bestiality. This is an exceedingly thin basis on which to find probable cause and then launch something as intrusive as a thorough search of a home for evidence of child pornography. Far from constituting sufficient facts to infer that Taylor was involved with child pornography or the exploitation of children, these references to "young girls" and Thailand did not reasonably support an inference of criminality. "Young" is a relative term, and while a few people who travel to Thailand intend to criminally exploit children, supposedly having been a tourist in Thailand adds little basis for believing that an individual tourist is a criminal—at least not without some significant corroboration of criminal wrongdoing.

We have often found probable cause lacking on more substantial facts. E.g., *Bell*, 585 F.3d at 1050 (affidavit did not establish probable cause where informant claimed there were "plastic baggies" with crack cocaine and a gun at a residence but provided "no indication of the amount of crack cocaine" or how the informant could identify it, and no recent information on location of firearm); *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003) (no probable cause where only details

informant gave were that she had been in the house and was shown drugs); *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002) (affidavit lacked adequate factual foundation where previously unknown informant testified that he had observed "approximately 150–200 pounds of marijuana …, two pounds of methamphetamine, a large bag of cocaine, and $30,000 in U.S. currency," as well as "fully automatic weapons" at defendant's residence).

Once we adjust for the false statements and omissions, there is even more reason to doubt that an issuing judge could discern a "substantial basis" for probable cause with respect to child pornography. The judge would have had no affirmative evidence of child pornography, and also would have learned of Doe's repeated assertions that Taylor had never expressed a sexual interest in children and the intimate quadrangle among Taylor, Doe, Santa, and Etter. Those relationships raise a substantial risk of bias. Two members of law enforcement involved in the investigation were potentially competing with the target of that investigation for the key informant's intimate favors. One introduced his "friend" to the officers who specialized in child exploitation crimes. The other was present during Doe's interview with those officers. These facts draw into question the veracity and reliability of Doe, Santa, and Etter. See *Glover*, 755 F.3d at 818 ("When an affidavit presents a close question as to probable cause …, any available credibility information is likely to be material to the magistrate's decision."). If an issuing judge were aware of the "complicated" relationships at play in this case, it could only diminish a basis for probable cause that was already paper-thin.

Still, the government argues that Taylor's references to
"young girls" and Thailand, the presence of children at the
Taylors' home, and Getz's training and experience were suffi-
cient to sustain the warrant. It should go without saying that
the mere presence of children in a home should not raise any
red flags. All there is to support probable cause is a reference
to "young girls," a reference to Thailand, and the fact that Tay-
lor had sent Doe an image of bestiality, which Getz implied,
but did not try to assert under oath, might indicate an indi-
vidual's interest in child pornography. (And if what Getz said
on the subject had any possible correlation, it was running the
wrong direction. Although the key sentence was missing a
critical verb, he implied that people involved with child por-
nography sometimes possessed images of bestiality, but not
vice versa.)

Courts have often found probable cause wanting on a
more substantial basis. We simply cannot find probable cause
for child pornography on these thin and ambiguous facts. By
analogy, imagine that drug investigators see a text that reads,
"If you're looking to score, I might be able to help you. Keep
in mind that I travel to Amsterdam on occasion." For probable
cause and the Warrant Clause to have any meaning, substan-
tially more is needed to issue a warrant.

2. *Probable Cause to Search for Evidence of Bestiality*

With respect to bestiality, the factual basis laid out in the
affidavit was more substantial. Getz noted that Doe boarded
"four horses on her property" and that Taylor had repeatedly
asked Doe if he and his wife could come over to "engage in
sexual activity with a horse." Text messages from both Taylor
and his wife to Doe corroborated Doe's account of the Taylors'

interest in bestiality. In those texts, Taylor himself had suggested sex with both horses and dogs.

Most important, Taylor had texted Doe a photo of "a dog licking the nude genitalia of a woman." The woman's face was not visible in the photo. On its own, sending an image of bestiality would not violate the Indiana Code, but the affidavit offered two reasons for Doe's belief that the woman depicted in the photo was Angela Taylor, and that would mean that at least one of the Taylors had actually engaged in bestiality, albeit without knowing the time or location. First, the affidavit pointed out, Taylor himself claimed that it was Angela in the photo. A text message accompanying the photo read: "Here's Angie with her ex's dog." Second, Getz asserted in the affidavit that Doe had said that "she had previously observed" Angela's body and could identify Angela by distinctive physical characteristics. Doe's description of Angela's physical features aligned with those of the woman in the photo. The first reason was sufficient to support probable cause, but Taylor has made at least a preliminary showing that the second reason was baseless.

Taylor's own text message to Doe said that it was his wife in the incriminating photo. But there is no evidence that Doe told the investigators that she claimed either to have seen Angela's body or to be able to identify her. The transcript of Doe's interview indicates that she thought Angela was the woman in the photo *only* because it said so "right on the text message." Perhaps Doe told the detectives that she could identify Angela's body at another time or off the record during her interview, but nothing in this record supports the affidavit's claim. While we are not yet willing to say, as Taylor

argues, that Getz "manufactured" this statement, it nonetheless appears to be false.

Along with the other false statements and omissions discussed above, this possible attempt to corroborate Taylor's own identification of his wife with a seemingly false statement is troubling, to say the least. The attempt is all the more jarring because it was not necessary. Both law enforcement and the issuing judge were entitled to credit Taylor's statement incriminating his wife. See *United States v. Harris*, 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."). That Taylor said that it was Angela in the photo was enough. There was no need to corroborate his claim with additional evidence, whether true or false.[4]

To be sure, understanding that a love quadrangle potentially existed among Taylor, Doe, Etter, and Santa, a neutral magistrate might discount Doe's statements about how avidly the Taylors had expressed an interest in bestiality. But even if we disregarded the entire interview with Doe, we would still have the image of bestiality that Taylor sent to Doe and Taylor's accompanying text claiming that it was his wife in the photo. That text message, on its own, was sufficient. Even accounting for arguably false statements and misleading omissions, the affidavit provided a substantial basis for concluding that a search was reasonably likely to turn up evidence of bestiality.

---

[4] As things turned out, law enforcement later discovered that the photo was *not* of Angela Taylor but was instead a photo that had been circulating for a while in the darker corners of the internet.

If this were the end of the inquiry, there might be no need for a *Franks* hearing. Probable cause to search for evidence of bestiality could have permitted the search, and any failure of probable cause for child pornography might have been harmless on the theory that child pornography would probably have been discovered in a search for evidence of bestiality. But we also have the problem posed by the alterations to the warrant itself. As we explain next, the warrant itself demands a hearing, and the affiant's credibility is called into question by the problems that the affidavit and warrant present when considered together.

B. *The Search Warrant*

We have never before encountered a search warrant that had handwritten alterations that were not at least initialed by a judge. The parties have not identified, and we have not found, any case where a court has upheld a search warrant that contained such unexplained alterations.

"General warrants do not satisfy the requirement of the Fourth Amendment that the warrant contain a description of the place to be searched and the persons or things to be seized. This particularity requirement protects persons against the government's indiscriminate rummaging through their property." *United States v. Jones*, 54 F.3d 1285, 1289–90 (7th Cir. 1995), citing *Dalia v. United States*, 441 U.S. 238, 255 (1979), and *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The requirement of particularity should prevent general searches. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to

prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). In other words, the requirement of particularity "ensures that the scope of a search will be confined to evidence relating to a *specific crime* that is supported by probable cause." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998) (emphasis added).

Here, we have a typed warrant—signed by the issuing judge and file-stamped by the issuing court—that authorized the search for and seizure of evidence relating to the specific crimes of "possession and/or distribution of child pornography." The warrant satisfied the particularity requirement for searching for evidence of child pornography, but that basis for the warrant was not supported by probable cause. As for evidence of bestiality, the warrant was supported by probable cause but did not satisfy the particularity requirement. Instead, we have only handwritten additions to the warrant, made by law enforcement, that purport to authorize a search for evidence of "bestiality." This is a problem.

Handwritten alterations are not necessarily fatal to the validity of a warrant. Other courts have upheld warrants where a judge agreed to the handwritten changes. For example, in *United States v. Waker*, 534 F.3d 168, 169–70 (2d Cir. 2008), the Second Circuit affirmed denial of a motion to suppress where the "search warrant form did not include a list of the items to be seized, but it did cross-reference the attached affidavit" and the issuing magistrate had "initialed the section of the affidavit that listed the items to be seized." In *United States v. Hill*, 500 F.2d 315, 316, 320, 323 (5th Cir. 1974), the Fifth Circuit likewise affirmed denial of a motion to suppress where law enforcement had given "oral testimony before the issuing magistrate … to bolster an otherwise deficient affidavit," and

the magistrate had then initialed a "handwritten notation on the affidavit" to the effect that the additional information supported the warrant. See also *United States v. Mendez-Sanchez*, 563 F.3d 935, 941 (9th Cir. 2009) (noting that district judge had upheld warrant where service date had been crossed out and changed, and it was apparent that "the magistrate judge had just accidentally begun to write" the wrong date but "had initialed his mistake"); *United States v. Johnson*, No. 06-CR-6134L, 2007 WL 542125, at *1, *5 & n.6 (W.D.N.Y. Feb. 16, 2007) (denying motion to suppress; warrant adequately stated with particularity the place to be searched where both warrant and application included "handwritten notation, initialed by the affiant and the issuing judge," that narrowed scope of search); *United States v. Alexander*, No. 2:04-CR-71, 2005 WL 8145754, at *1, *3–4 (N.D. Ind. Feb. 9, 2005) (denying motion to dismiss indictment where defendant claimed law enforcement had falsified date on search warrant, but government was able to provide adequate explanation, namely that magistrate judge had "changed the date on the search warrant by hand and initialed the change on the document"); *United States v. Werber*, No. 90 Cr. 364 (LMM), 1991 WL 173158, at *4–5 (S.D.N.Y. Aug. 27, 1991) (denying motion to suppress where supporting affidavit's service date was incorrect as typed but issuing judge had corrected it and initialed the change); *United States v. Giovanelli*, 747 F. Supp. 891, 895, 897 (S.D.N.Y. June 7, 1989) (denying motion to suppress where service date had been changed but issuing magistrate had initialed change); *State v. Norwood*, 279 S.E.2d 550, 553 (N.C. 1981) (issuing magistrate changed date on both warrant and affidavit and initialed changes); *State v. Gosch*, 339 P.3d 1207, 1211, 1213 (Idaho App. 2014) (implicitly approving handwritten alteration to warrant initialed by magistrate).

Going a little further out on the legal limb, a few cases have held that the issuing judge herself need not make the physical alteration if the judge approves the change before the warrant is executed. See *United States v. Payne*, 341 F.3d 393, 398, 404 (5th Cir. 2003) (affirming denial of motion to suppress where law enforcement "handwrote [an] additional allegation, as well as a correction of [the defendant's] address, on the affidavit," and "then presented it to the magistrate, who initialed the handwritten material to validate its inclusion in the affidavit").

The most lenient case we have found is *United States v. Arenal*, 768 F.2d 263, 267 (8th Cir. 1985), where the Eighth Circuit upheld warrants where a judge approved alterations before the warrants were executed but initialed the handwritten changes only after the warrants were executed. In that case, an officer noticed that one address of an apartment to be searched had been typed correctly in some places but mistakenly in others. The officer called a state judge who told him to make the necessary corrections and to execute the warrants. The officer made the changes and initialed them, and the judge later initialed the corrections as well. The federal district court and Eighth Circuit found no reason to suppress the evidence seized in the search, for the officer was entitled to rely on the judge's assurance that he had authority to carry out the searches.

Given the current state of this record, the government is asking us to go into unknown territory. We know that the issuing judge found probable cause to search for evidence of child pornography, but we have no evidence—no signature or initials—that the judge found probable cause to search for evidence of bestiality. The government asserts that the issuing

judge requested the changes and that Detective Getz made the changes in the judge's presence before the warrant was signed. That seems like an odd way to have handled the problem, and the government presents no evidence in support. We cannot safeguard the Fourth Amendment by merely accepting the government's word on such a critical point unsupported by the record.

That is not to say, however, that we should hold this warrant invalid in this appeal. Where objective evidence of the issuing judge's approval is wanting, the remedy is not necessarily to invalidate the warrant. Rather, when other courts have been confronted with unexplained alterations to warrants, they have held hearings on the circumstances. See *United States v. Blake*, No. CR205-48, 2006 WL 3933681, at *1, *3 (S.D. Ga. Sept. 7, 2006) (adopting magistrate's recommendation to deny defendant's motion to suppress where "handwritten language on the face of the search warrant … was not initialed" by the issuing magistrate but "uncontradicted evidence" showed that handwritten language on warrant was added in front of the issuing judge and at his request); *Battle v. State*, 597 S.E.2d 417, 418–19 (Ga. App. 2004) (affirming denial of motion to suppress where trial court had found that, among competing affidavits, a four-page affidavit had been properly submitted to the issuing magistrate even though that magistrate could not recall which affidavit had been presented to her and testified that "she had never seen an affidavit as long as four pages," but only the four-page affidavit was initialed by issuing judge and certified by the clerk of the magistrate court); *Barnes v. State*, 876 S.W.2d 316, 327–28 (Tex. Crim. App. 1994) (en banc) (affirming denial of motion to suppress evidence obtained pursuant to warrant that failed expressly to incorporate underlying affidavit's appendices

where testimony adduced at a hearing revealed that issuing magistrate had suggested and made handwritten changes to appendices before he signed the warrant and both magistrate and affiant had initialed those changes).

The proper resolution of this appeal is clear. Where a warrant has material handwritten alterations that have not been signed or initialed by the issuing judge, the warrant's validity is called into doubt. When confronted with such a facially questionable warrant, a court should hold an evidentiary hearing to determine whether the issuing judge had approved those changes, and if so, when and how. The particularity requirement cannot be satisfied so long as questions surrounding material alterations to a warrant remain unanswered.

Such a hearing may not always be necessary, such as where unexplained alterations are obviously immaterial or perhaps if the contents and circumstances make a benign explanation obvious. In this case, however, a hearing is necessary. The affidavit supported probable cause for bestiality, but not for child pornography, while the typed and signed warrant was facially valid for child pornography, but not for bestiality. In other words, the constitutionality of this search can be based only on probable cause to search for evidence of bestiality.

## Conclusion

An evidentiary hearing is needed to determine whether the issuing judge approved the alterations to the warrant prior to its execution. Questions surrounding those alterations will be relevant to the *Leon* good-faith exception to the exclusionary rule, so that hearing must also encompass false statements and material omissions in the underlying affidavit

and law enforcement's subjective good faith in seeking the search warrant. Whether the evidence at that hearing can cure the warrant's constitutional problems is a question for the district court to address after finding the necessary material facts. We express no view on that question at this time.

The judgment of the district court is VACATED and the case is REMANDED for proceedings consistent with this opinion.